UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JILL T.,

        Plaintiff,

     v.

CALIFORNIA PHYSICIANS SERVICE
DBA BLUE SHIELD OF CALIFORNIA, et
al.,

        Defendants.

Case No.  23-cv-01065-WHO

**ORDER GRANTING DEFENDANTS'
MOTIONS FOR JUDGMENT AND
DENYING PLAINTIFF'S MOTION
FOR JUDGMENT**

Re: Dkt. Nos. 32, 33, 34, 35, 36, 40

This matter comes before me on cross motions for judgment in an underlying Employee

Retirement Income Security Act, 29 U.S.C. § 1001 *et seq* ("ERISA"), lawsuit filed by plaintiff Jill

T. against  defendant California Physicians' Service (dba Blue Shield of California) ("Blue

Shield") and defendants Magellan Health Services of California, Inc – Employer Services

("Health Services") and Human Affairs International of California ("HAIC") (together, the

"Magellan Defendants").  Jill T. seeks to recover benefits under health plans (the "Plans") offered

by Blue Shield and administered by HAIC for more than two years' worth of residential mental

health treatment that her minor son, M.F., underwent to treat his mood disorders.  Defendants

maintain that they were not required to cover the residential treatment because it was not

medically necessary and because Jill T. never obtained prior authorization for the treatment from

the Plans' Mental Health Service Administrator ("MHSA"), HAIC.

I am sympathetic with the situation Jill T. faced in providing the best care for her son, and

Blue Shield made some errors in handling her claims.  But reviewing its decisions de novo, I

conclude that Blue Shield was correct in denying coverage because M.F. did not meet the

"medically necessary" criteria, and Jill T. did not seek prior authorization before placing M.F. in

residential treatment. Accordingly, I will grant judgment in the defendants' favor (and deny Jill

1   T.'s motion).[1]

2                              **BACKGROUND**

3       **A.    The Plans**

4       M.F. was covered through his mother under the EastWest Bank Employee Benefit Plan

5   issued by Blue Shield.  Blue Shield contracted with the Magellan Defendants to administer mental

6   health and substance use disorder claims for Blue Shield insureds.  *See* Magellan Defendants'

7   Motion for Judgment [Dkt. No. 34].[2]

8       The Evidence of Coverage (EOC) documents provided by Blue Shield for both the

9   2020/2021 and the 2021/2022 Plans state that Blue Shield provides coverage for treatment that is

10  deemed "medically necessary" under the terms of the Plans.[3]  "Medically necessary" is defined in

11  relevant part as follows:

12              Services that are Medically Necessary include only those which have
                been established as safe and effective, are furnished under generally
13              accepted professional standards to treat illness, injury or medical
                condition, and which, as determined by Blue Shield, are:
14                      a. consistent with Blue Shield medical policy;
                        b. consistent with the symptoms or diagnosis;
15                      c. not furnished primarily for the convenience of the patient,
                        the attending Physician or other provider;
16                      d. furnished at the most appropriate level which can be
                        provided safely and effectively to the patient; and
17                      e. not more costly than an alternative service or sequence of
                        services at least as likely to produce equivalent therapeutic or
18                      diagnostic results as to the diagnosis or treatment of the
                        Member's illness, injury, or disease.

19  *See* CPS-JILLT-0000073; CPS-JILLT-0000172 (Evidence of Coverage Documents).  According

20  to the EOC documents, both Plans also give Blue Shield the right to use "[p]hysician consultants,

21

22  ───────────────────────

23  [1] All parties have filed administrative motions to seal the unredacted versions of their briefs, and
    the administrative record has been filed under seal.  Good cause shown, all motions to seal are
    GRANTED.  *See* Dkt. Nos. 33, 34, 40,

24  [2] The Magellan Defendants state in their motion for judgment that HAIC is contracted with Blue
25  Shield to serve as the Mental Health Services Advisor for the Plans.  *See* Magellan Def's Motion
    [Dkt. No. 34] Section II(A).  Magellan Employer Services (named as a defendant) is a corporate
26  affiliate of HAIC, but it provides administrative services for Employee Assistance Plans, which
    the operative Plans are not.  Magellan Employer Services is not a proper party to this lawsuit,
27  which Jill T. does not appear to contest.  Final judgment is granted in its favor.

28  [3] As I discuss later, the record in this case contains only summaries of the Plan documents rather
    than the Plans themselves. *See* discussion *infra* Section I.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    peer review committees of professional societies or Hospitals, and other consultants to evaluate

2    claims," including for medical necessity.  *See* CPS-JILLT-0000052-53; CPS-JILLT-0000073;

3    CPS-JILLT-0000175.  And with respect to residential treatment of non-emergent mental health

4    and substance use disorders, both require prior authorization for all "non-emergency mental health

5    or substance use disorder Hospital admissions including acute inpatient care and Residential case."

6    CPS-JILLT-0000027; *see also* CPS-JILLT-0000115.

7        The Plans provide for one level of internal appeal for coverage decisions; a member

8    "contacts the [Mental Health Service Administrator]" (here, HAIC) "to request a review of an

9    initial determination concerning a claim or service." CPS-JILLT-0000065.  Members may also

10   request a grievance "by submitting a letter or a completed 'Grievance Form' that is mailed to Blue

11   Shield." *Id.*  After that, members may submit an appeal to the California Department of Managed

12   Health Care (DMHC) if they wish to submit grievances against their health plan.  *See* CPS-JILLT-

13   0000556-57.

14       **B.    M.F.'s Health Care History**

15       M.F. has a history of disruptive mood dysregulation disorder, autism spectrum disorder,

16   attention-deficit hyperactivity disorder ("ADHD"), unspecified depressive disorder, and anxiety.

17   CPS-JILLT-0000670, CPS-JILLT-0004289.  Starting in 2015, M.F. was seen weekly by a

18   psychologist for outpatient treatment.  CPS-JILLT-0004545-46.  Every 1-3 months, M.F.'s family

19   participated in family therapy sessions to treat his aggressive behavior.  CPS-JILLT-0000808-09.

20   His behavior improved at times between 2015 and 2020, *see id.*, but he still had violent outbursts

21   at home, sometimes causing his family members physical injury, and on one occasion forcing

22   them to call the police to intervene. CPS-JILLT-0004178; CPS-JILLT-0004535-38.  The last

23   violent outburst apparently happened sometime in early 2020.  CPS-JILLT-0002253-54 (Report of

24   Samantha Levy, Ph.D).

25       In 2018, M.F. was admitted to a six-week partial hospitalization program at the University

26   of California, Los Angeles Resnick Neuropsychological Hospital.  CPS-JILLT-0004178.  He

27   experienced periods where he refused to care for himself or participate in school or therapy.  CPS-

28   JILLT-0004181-82.  He once said that he might want to die. CPS-JILLT-0004182; CPS-JILLT-

0002255 (Report of Dr. Levy, stating that during the COVID-19 pandemic, sometime in early 2020, "[a]fter a particularly violent episode where he bit and punched his father, [M.F.] started talking about wanting to 'just die and join his grandfather.'").  In May 2020, M.F. was admitted to Blue Fire for the first time.  He was thirteen years old.

M.F.'s parents determined that he needed to attend a residential mental health treatment program.  They sent him first for wilderness therapy treatment at Blue Fire from June 3, 2020, to August 16, 2020, *see* CPS-JILLT-0000420, and then to a residential treatment program at Cherry Gulch, where he remained from August 20, 2020, through June 2022, *see* CPS-JILLT-0002240.

### C.    Plaintiff's Claims and Blue Shield's Responses

Jill T. telephoned Blue Shield on May 6, 2020, about utilizing the out-of-network Blue Fire inpatient mental health program for M.F.  CPS-JILLT-0000204.  She was told that she had to contact Blue Shield's MHSA, HAIC, to obtain "prior authorization" for treatment at Blue Fire.  *Id.*  She never obtained this prior authorization.

Between 2020 and 2022, Jill T. made multiple claims for coverage of her son's treatment.  Blue Shield issued dozens of "Explanations of Benefits" documents (EOBs) in response, explaining why her claims were being denied.  Several EOBs stated that the coverage was not medically necessary, and some stated that the coverage plaintiff sought was being denied because it involved a service that was not pre-authorized.  *See e.g.* CPS-JILLT-0000662-63 (EOB issued January 29, 2021, denying claim for $47,005.00, stating "[n]o benefits are allowed because pre-authorization was not obtained prior to these services being rendered"); CPS-JILLT-0005097 (EOB issued March 29, 2021, denying claim for $3,535.92, explaining that "[t]he Health Plan Medical Director has reviewed the submitted medical documentation and has determined the service is not medically necessary as established in the Health Plan Medical Policy. Upon request the scientific or clinical judgment used for the determination will be provided to you free of charge."); CPS-JILLT-0005119 (EOB issued April 19, 2021, denying claim for $8,866.27, explaining "[t]his service is specifically excluded from coverage under the subscriber's Health Plan"); CPS-JILLT-0005173 (EOB issued November 29, 2021, denying claim for $11,950.19, stating "[t]he Health Plan Medical Director has reviewed the submitted medical documentation

1   and has determined the service is not medically necessary as established in the Health Plan

2   Medical Policy"); CPS-JILLT-0005209 (EOB issued December 23, 2022, denying claim for

3   $11,950.19, stating the same).

4        Blue Shield issued two EOBs with erroneous coverage explanations.  On January 5, 2021,

5   Blue Shield finalized a claim it received on December 4, 2020, seeking coverage for $47,005.00

6   worth of room and board at Cherry Gulch.  It stated: "We have suspended processing of this claim

7   because we have no record of the required prior authorization from our *radiology Care*

8   *Management program* - National Imaging Associated (NIA). When the NIA authorization is

9   received we will resume processing of this claim. Please contact NIA at 1-888-642-2583 for

10  authorization. If this information is not received within 45 days of your receipt of this request

11  please consider this claim denied." Blue Shield issued another EOB on January 12, 2021,

12  finalizing a different claim, again citing the radiology authorization issue.  *See* CPS-JILLT-

13  0000238.

14       On January 26, 2021, Jill T. contacted Blue Shield's Customer Service.  Blue Shield

15  acknowledged that the EOBs issued on January 5 and January 12 mistakenly cited radiology

16  authorization as a reason for suspending processing of her claim.  *See id.*  She was told to "file an

17  appeal" of that coverage decision: Blue Shield explained that "the claim should still be

18  reprocessed for the sake of accuracy to reflect correct denial reasons; radiology auths have nothing

19  to do with RTC auths." *Id.*  Blue Shield's customer service summary task notes further state that a

20  Blue Shield representative "re-processed the claim" to "more accurately reflect denial so the AGD

21  rep will be able to review the appeal on the proper context – as will DMHC (if it comes to the

22  second level appeal)." *Id.*  On February 12, 2021, Jill T. submitted a "Grievance Form" to Blue

23  Shield, attaching a letter addressed to "Level One Member Appeals," taking issue with the

24  erroneous EOB statements that cited "[no] prior authorization from [Blue Shield's] radiology Care

25  Management program" as a reason for "suspending processing" of her claim.  CPS-JILLT-

26  0000414-22.

27       On February 14, 2021, Blue Shield paid Jill T. $10,811.54, which Blue Shield says was a

28  mistake.  On February 22, 2021, Jill T. placed a grievance call to Blue Shield Customer Service.

United States District Court
Northern District of California

1   CPS-JILLT-0000244.   Blue Shield responded to her grievances twice; once on March 23, 2021,

2   *see* CPS-JILLT-0000603-04, and again on May 7, 2021, *see* CPS-JILLT-0000627-29.   The first

3   response explained why coverage was denied for M.F.'s stay at Cherry Gulch from August 23,

4   2020, to October 31, 2020, and the second explained why it was denied for his stay at Blue Fire

5   from June 2, 2020, to August 16, 2020.

6        Both response letters stated:

7            A Blue Shield Medical Director has reviewed the information
             provided and determined that the requested services would not be
             covered as medically necessary under the terms of this health plan …

8            Your request for treatment for your problem with communication and
             social skills (Autistic Disorder) and Mental Health (Mood; Attention

9            Deficit Hyperactivity) Disorders in a program (Residential Treatment
             Program-RTC) where you spend 24 hours under medical and nursing

10           care at Blue Fire Wilderness Therapy from [relevant dates], cannot be
             approved for payment.

11
     *See* CPS-JILLT-0000603-04; CPS-JILLT-0000627-29.   The March 23, 2021, letter stated that the

12
     reason for denial was that "[b]ased on the medical records sent in, you were not planning to harm

13
     yourself and could take care of many of your daily needs. You did not need around-the-clock care.

14
     You did qualify for Outpatient Care (with a Psychiatrist or Therapist) and Care in the

15
     Community." CPS-JILLT-0000604.   The May 7, 2021, letter stated the reason for denial was that

16
     "[a]s of June 3, 2020, you were not planning to hurt yourself or others and able to care for

17
     yourself. As of June 3, 2020, you did not need around-the-clock care. You could have been treated

18
     for your Autistic and Mental Health Disorders and related symptoms as an outpatient with a

19
     mental health therapist of Psychiatrist." CPS-JILLT-0000627.

20
         Both letters also included:

21           This decision was based on Blue Shield guidelines created by the
             American Academy of Child and Adolescent Psychiatry to find out

22           which is the best type of treatment (level of care) that is needed to
             treat your mental health problems. These guidelines are called the

23           Child and Adolescent Level of Care Utilization System, or
             CALOCUS. Your appeal was also looked at by independent Child

24           and Adolescent Psychiatrist who agrees with this determination
             stating that as of June 20, 2021 [sic], a Residential Treatment Program

25           was 'considered not medically necessary for the treatment for the
             treatment of (your) mood disorder, autism and ADHD.'

26
     *See* CPS-JILLT-0000603-04; CPS-JILLT-0000627-29.   The administrative record contains the

27
     peer reviewer final reports that the letters reference.   CPS-JILLT-0000616, 0001972 (Peer

28

1   Reviewer Reports).  Those letters show that a "peer reviewer" considered the CALOCUS-CASII

2   guidelines.

3          The CALOCUS-CASII guidelines were established by the American Academy of Child

4   and Adolescent Psychiatry to determine the service needs for children and adolescents.[4]  They

5   evaluate the following six dimensions, resulting in a score for each between 1 - 5: (1) risk of harm;

6   (2) functional status; (3) co-occurrence of developmental, medical, substance use and psychiatric

7   conditions; (4) recovery environment; (5) resiliency and response to services; and (6) engagement

8   and recovery status.  *See* CALOCUS-CASII Guidelines.  A composite score of 23 or higher

9   requires placement in "non-secure, 24-hour services with psychiatric monitoring."  *Id.*  A score of

10  four in any of the first three dimensions—regardless of the composite score—automatically

11  compels the same.  *Id.*

12         The peer reviewer determined that from June 3, 2020, to August 16, 2020, and from

13  August 23, 2020, to October 31, 2020, (the dates for which Jill T. sought coverage), M.F. had a

14  CALOCUS-CASII score of 15, which "did not meet CALOCUS criteria for residential treatment

15  level of care" and his score was "consistent with outpatient treatment." *Id.*

16         **D.     The Appeals**

17         After Blue Shield denied Jill T.'s internal request for a change in coverage decision, she

18  submitted independent review organization requests ("IRO requests") to the Department of

19  Insurance ("DOI") seeking review of the defendants' denial of the Blue Fire and Cherry Gulch

20  claims.  CPS-JILLT-002231; CPS-JILLT-0000476; CPS-JILLT-0000532.  In her 55-page IRO

21  request for review of Blue Shield's coverage decisions with respect to Cherry Gulch, she stated

22  that she received a denial from Blue Shield regarding M.F.'s treatment at Cherry Gulch "from

23  August 23, 2020, forward," and wrote to "request a full independent review of the adverse benefit

24  determination."  CPS-JILLT-0000476.  She attached all appropriate forms.  In her appeal, she

25

26  ─────────────────

27  [4] As Blue Shield notes in a footnote, *see* Blue Shield Motion 12, n.4, its initial review of plaintiff's
    claims was performed based on CALOCUS—later, after the claims at issue were denied,
    CALOCUS and the Child and Adolescent Service Intensity Instrument ("CASII") merged, so later

28  reviews of M.F.'s claim were evaluated pursuant to the merged tool, the CALOCUS-CASII tool.
    Those guidelines will inform my analysis.

United States District Court
Northern District of California

1  contended that M.F.'s treatment was medically necessary and explained that she had attached

2  copious medical evidence to her IRO request such that Blue Shield's decision could be

3  scrutinized.  She made similar arguments for her 21-page IRO request for review of Blue Shield's

4  coverage decision with respect to M.F.'s stint at Blue Fire from June 3, 2020, to August 20, 2020.

5  *See* CPS-JILLT-0000533.

6         Following the proper procedure, Blue Shield processed the IRO request through to the

7  DMHC.  The DMHC instructed MAXIMUS Federal Services, a government contractor, to review

8  Blue Shield's coverage determination. MAXIMUS determined that M.F.'s CALOCUS-CASII

9  score was higher than Blue Shield had initially scored it, but still below the level that would justify

10  the kind of 24-hour residential care provided at Blue Fire and Cherry Gulch.

11         MAXIMUS listed M.F.'s diagnoses as "disruptive mood dysregulation disorder, autism

12  spectrum disorder, attention-deficit hyperactivity disorder (ADHD), and unspecified depressive

13  disorder." CPS-JILLT-0000670.  It stated that it reviewed M.F.'s medical records dated April 5,

14  2017, through October 25, 2021, the IRO request letter written by plaintiff dated November 1,

15  2021, the attached letter from Sarah Cacciato dated August 6, 2021, (Cacciato is an educational

16  therapist who worked with M.F. from April 11, 2020, to May 27, 2020, *see* CPS-JILLT-0004543),

17  and the attached letter from Samantha Levy, Ph.D., dated June 5, 2021 (Dr. Levy was M.F.'s

18  therapist who saw him weekly from July 2015 to May 2020, *see* CPS-JILLT-0004545).

19         MAXIMUS's medical expert went through the CALOCUS-CASII dimensions.  It scored

20  M.F. as follows:

21     • Dimension 1 ("Risk of Harm") – Score 3

22     • Dimension 2 ("Functional Impairment") – Score 3

    • Dimension 3 ("Comorbidity") – Score 3

23     • Dimension 4(a) ("Recovery Environment - Stress") – Score 3

24     • Dimension 4(b) ("Recovery Environment - Support") – Score 3

    • Dimension 5 ("Resiliency") – Score 4

25     • Dimension 6 ("Engagement in Treatment") – Score 2

26  The findings resulted in a composite score of 21.  MAXIMUS reported that a score of 21 on the

27  CALOCUS-CASII mechanism was consistent with "Level 4 medically monitored community

28  based services . . . [and] the wilderness services and RTC services were not in accordance with the

1    generally accepted standards of mental health and substance use disorder care, or clinically

2    appropriate in terms of type, frequency, extent, site, and duration."  It concluded, "[o]ur medical

3    expert decided that wilderness therapy services provided from 6/3/20 through 8/16/20, and RTC

4    services provided from 8/23/20 through 10/31/20 were not medically necessary for the enrollee."

5    CPS-JILLT-0000669-675 (DMHC Final Determination Letter).

### LEGAL STANDARD

7        The parties have filed cross-motions for judgment under Federal Rule of Civil Procedure

8    52.  When presented with Rule 52 motions for judgment, " 'the court conducts what is essentially

9    a bench trial on the record.'" *Rapolla v. Waste Mgmt. Emp. Ben. Plan*, No. 13-CV-02860- 9 JST,

10   2014 WL 2918863, at *4 (N.D. Cal. June 25, 2014) (citing *Kearney*, 175 F.3d at 1095).

11       The standard of review for a denial of ERISA benefits depends upon the terms of the

12   benefit plan.  A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) "is to be reviewed

13   under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary

14   authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire*

15   *& Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If "the benefit plan expressly gives the plan

16   administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe

17   the Plan's terms," an abuse of discretion standard applies. *Id.* at 102.

### DISCUSSION

19   **I.    THE APPROPRIATE STANDARD OF REVIEW IS DE NOVO**

20       The parties disagree over the correct standard of review for some of the coverage decisions

21   in this case.  I will resolve this preliminary issue before turning to the merits.

22       The court reviews benefits denials de novo "unless the benefit plan gives the administrator

23   or fiduciary discretionary authority to determine eligibility for benefits"; if the plan does grant

24   such discretionary authority, the court reviews the administrator's decision for abuse of discretion.

25   *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Salomaa v. Honda Long*

26   *Term Disability Plan*, 637 F.3d 958, 965 (9th Cir. 2011).  Additionally, the Ninth Circuit has held

27   that where the administrator of the benefits plan has a conflict of interest, then the abuse of

28   discretion review is further modified, and the court must review the benefits decision

United States District Court
Northern District of California

1   "skeptically," if not de novo.  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 959, 965 (9th

2   Cir. 2006).

3        The parties agree that the appropriate standard of review is de novo with respect to

4   coverage decisions made based on the terms of the 2021/2022 Plan.  *See* Blue Shield Motion for

5   Judgment ("Blue Shield Motion") [Dkt. No. 32] 15.  California Health and Safety Code Section

6   1367.045(a) provides that, "if a health care service plan contract offered, issued, delivered,

7   amended, or renewed on or after January 1, 2021, contains a provision that reserves discretionary

8   authority to the plan, or an agent of the plan, to determine eligibility for benefits or coverage, to

9   interpret the terms of the contract, or to provide standards of interpretation or review that are

10  inconsistent with the laws of this state, that provision is void and unenforceable."  Cal. Health and

11  Safety Code § 1367.045(a).  Blue Shield's 2021/2022 Plan contained such a provision.

12       The dispute is over the scope of review for the 2020/2021 Plan.  Blue Shield argues that it

13  "confers upon Blue Shield, as the claims administrator, broad discretion to interpret the Plan's

14  terms and determine eligibility."  Blue Shield Motion 14:18-22.  It claims that the Plan reads, in

15  relevant part: "Blue Shield shall have the power and authority to construe and interpret the

16  provisions of this Plan, to determine the Benefits of this Plan and determine eligibility to receive

17  Benefits under this Plan." *See* Declaration of Jason Wu ("Wu Decl.") [Dkt No. 30], Ex. 1-1 (CPS-

18  JILLT-0000063).  But because that language is found in the summary of the Plan, and not the Plan

19  itself, it does not confer discretion and I will review the coverage decisions de novo.[5]

20       In *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), the United States Supreme Court held

21  that summary plan descriptions do not have the power to confer discretionary authority.  In this

22  case, the EOC documents for both Plans state that the EOC is only a summary of the Health Plan.

23  *See e.g.*, CPS-JILLT-000002 (Evidence of Coverage and Disclosure Form for Custom PPO

24  Savings Two-Tier Embedded 1500/2800/3000, effective June 1, 2020, stating: "This Evidence of

25

26  _____

27  [5] Jill T. also contends that California Insurance Code § 10110.6 mandates that I review the issue
    de novo.  That argument is incorrect: section 10110.6 is limited to life and disability insurance and
    does not apply here.  *See Bain v. United Healthcare Inc.*, 2016 WL 4529495-EMC, at *7 (N.D.

28  Cal. Aug. 30, 2016).

Coverage and Disclosure Form (EOC) constitutes only a summary of the Health Plan.  The health plan contract must be consulted to determine the exact terms and conditions of coverage.").

*Prichard v. Metropolitan Life Ins. Co.*, 783 F.3d 1166 (9th Cir. 2015) is on point.  There, plaintiff brought an ERISA action against the plan's administrator challenging its decision to deny his claim for long-term disability benefits.  The district court reviewed the insurer's decision for an abuse of discretion, and plaintiff appealed, arguing that it should have reviewed de novo.  There, the only language conferring discretionary authority to the insurer appeared in a Summary Plan Description ("SPD"), not the terms of the plan itself.  Following *Amara*, the Ninth Circuit held that the SPD did not have the power to confer that authority.  *See Prichard*, 783 F.3d at 1169.

The insurer in *Prichard* argued that plaintiff "misapprehend[ed] the scope of the Plan," and insisted that the SPD *was* the Plan, but that argument did not prevail.  The Ninth Circuit pointed out the distinction between summaries and the plan documents in the statutory language:

> " '[A]n employee welfare benefit plan or an employee pension benefit plan or a plan which is both,' 29 U.S.C. § 1002(3), and it requires that a 'plan' 'be established and maintained pursuant to a written instrument,' *id*. § 1102(a)(1). An SPD, in contrast, is a disclosure meant 'to reasonably apprise [plan] participants and beneficiaries of their rights and obligations under the plan.' *Id*. § 1022(a)."

*Prichard*, at 1169.

Blue Shield's arguments to the contrary are meritless.  First, it posits that the EOC's breadth belies any argument that it is merely a summary, but that argument finds no support in the caselaw and is unpersuasive.  *See* Blue Shield Response to Pl's Motion for Judgment ("Blue Shield Oppo.") [Dkt. No. 40-2] 8-9 (sealed).  Mere verbosity does not transform a document's core function.  It also argues that just because the EOC contains a summary, that "does not convert the entire EOC into a summary." *Id.*  That is true: the Ninth Circuit recognized in *Prichard* that some health plans are consolidated such that the plan document and the summary take the form of a single document.  *See Prichard*, 783 F.3d 1166, 1169.  But Blue Shield has not produced evidence that this is the situation here.  To the contrary, the EOC itself states that it is "only a summary of the Health Plan," and that an entirely separate document exists—the "health plan contract"—that insureds should consult to "determine the exact terms and conditions of coverage." CPS-JILLT-000002.

United States District Court
Northern District of California

Blue Shield also protests that Jill T. never requested the full health care plan, and that the EOCs are the "only plan documents in the administrative record." Blue Shield Oppo. 8:11-17. Whether Jill T. requested the full Plan is irrelevant, and the EOC speaks for itself.  Any "grant of discretion" offered by the EOC is ineffectual.  I will review all coverage decisions de novo.[6]

## II.    CLAIM 1: DENIAL OF BENEFITS UNDER ERISA § 502(1)(1)(B), 29 U.S.C. § 1132(A)(1)(B)

A court that employs de novo review in an ERISA case "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).  Generally, the court's review is limited to the evidence contained in the administrative record. *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) (explaining that in de novo ERISA case, "extrinsic evidence could be considered only under certain limited circumstances").  "[W]hen the court reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant." *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010).  In other words, the plaintiff has the burden to show her claim falls within the scope of coverage.  *Id.*  "Under the federal common law of ERISA," courts "'interpret terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence and experience.' " *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir. 2002) (quoting *Babikian v. Paul Revere Life Ins. Co.*, 63 F.3d 837, 840 (9th Cir. 1995)).

Jill T.'s first claim alleges that the defendants violated ERISA § 502(a)(1)(B), 29 U.S.C. 1132(a)(1)(B) by denying her mental health claim for coverage of her son's stays at Blue Fire and Cherry Gulch.  Defendants respond that the denial of residential care coverage for M.F.'s time at Blue Shield and Cherry Gulch was reasonable because the treatment was not medically necessary and was not pre-authorized.[7]  Blue Shield Motion 16-20; HAIC Motion 8-9.

---

[6] Accordingly, I will not address Jill T.'s alternative argument that I should review decisions made pursuant to the 2020/2021 Plan de novo because Blue Shield operates under a "structural conflict of interest" insofar as the Plan is "fully-insured," meaning that Blue Shield both determines whether Plan participants are eligible for medical benefits and pays benefits out of its own funds." *See* Pl's Motion for Judgment ("Pl's Motion") [Dkt. No. 36] 14-15.

[7] Blue Shield also argues that coverage for Cherry Gulch was properly denied because it is a

### A.   HAIC is Not a Proper Defendant to Plaintiff's Section 502(a)(1)(B) Claim

As a preliminary matter, HAIC is not a proper defendant to this claim.  Section 1132(a)(1)(B) permits an ERISA participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B). While ERISA liability under this section is not limited to a Plan or a Plan Administrator—it can theoretically be cognizable against a MHSA like HAIC—the defendant must be someone "responsible for paying legitimate benefits claims," or an entity who can "redress[ ] the act or practice [that] violates any provision" of ERISA.  *See Cyr v. Reliance Standard Life Ins. Co.*, 642 F.3d 1202, 1207 (9th Cir. 2011) (en banc) (cleaned up); *see also Echague v. Metropolitan Life Ins. Co.*, 43 F. Supp. 3d 994, 1007 (N.D. Cal. 2014) (holding that where a party "ha[s] no authority to resolve benefit claims or any responsibility to pay them, [it] is not the proper defendant for an action to recover benefits as authorized by § 1132(a)(1)(B).").

There is no evidence that HAIC has or ever had the authority to pay Jill T.'s benefit claims. HAIC is a delegated authority to review prior authorization requests to determine whether a treatment is medically necessary.  Jill T. never sought prior authorization from HAIC.  *See infra* Section II(C).  Its only involvement was limited to collecting M.F.'s information to provide the DMHC with a record upon which to evaluate Blue Shield's coverage decisions.  *See* CPS-JILLT-0002201-11.  It cannot be liable for this claim.[8]

### B.   The Treatment M.F. Received Was Not Medically Necessary Under the Terms of the Plan

Blue Shield used the CALOCUS-CASII tool to arrive at M.F.'s coverage determination.

---

'therapeutic school for boys.'" Blue Shield Motion 20-21 (citing CPS-JILLT-0000616).  Cherry Gulch, it says, was licensed only as a childcare facility, not a psychiatric residential treatment center.  *See id.* (citing CPS-JILLT-0002202).  The EOC excludes coverage for "[s]ervices provided by an individual or entity that […] is not appropriately licensed or certified by the state to provide health care services." CPS-JILLT-0000153.  But this justification for coverage denial was not clearly communicated to Jill T. through the claim denial process and was not a main reason why her claims were denied.  I will not rest my decsion on that argument.

[8] Even if HAIC were a proper party defendant, the merits analysis that follows would apply to HAIC and justify judgment in its favor.

*See* CPS-JILLT-0000375-75, CPS-JILLT-0000601-03.  On appeal, the DMHC used the same tool to review that coverage determination.  *See* CPS-JILLT-0000667-73.  The parties agree that this is the correct tool to use for M.F.'s coverage evaluation.  Both Blue Shield and the DMHC determined that M.F.'s conditions did not score high enough to justify his stays at Blue Fire or Cherry Gulch.[9]  I will use the same tool to conduct my de novo review of M.F.'s condition.

### 1.   Blue Fire

Blue Shield recognized that at the time of his admittance to Blue Fire, M.F. had been diagnosed with mood disorders, mild autism disorder, anxiety, attention-deficient hyperactivity disorder (ADHD), and an unspecified depressive disorder. .  It determined, using CALOCUS, that M.F. could have been treated "as an outpatient with a mental health therapist or Psychiatrist" rather than receiving 24-hour care, however.  CPS- JILLT-0000374 (Notice of Decision dated May 7, 2021).

The independent review organization Advanced Medical Reviews ("AMR") issued a report breaking down the reasoning behind denying coverage for M.F.'s stay at Blue Fire between June 3, 2020, and August 16, 2020.  The report was authored by a trained child psychologist after reviewing M.F.'s record.  It states:

> The patient is a 14 year old male with DMDD, ADHD, autism and anxiety admitted to residential mental health treatment in a wilderness setting on 6/3/20. The patient has a history of mood swings, defiance, verbal and physical "abuse". Prescribed medications included Lamictal, sertraline and Intuniv. The patient denied suicidal and homicidal ideation. The patient was discharged on 8/16/20.

*See* CPS-JILLT-0000723 (Independent Reviewer Report).  It explains that based on the CALOCUS guideline (attached to the Report), the Residential Behavior Health dated June 3, 2020, through August 16, 2020 (his time at Blue Fire), was not considered medically necessary because:

> There is no initial psychiatric evaluation in the documentation provided. There is mention of an assault that the patient suffered and depression, prior to admission, but no suicidal or homicidal ideation. The notes did not document any *ongoing* self-injurious behaviors, physical aggression, psychosis or significant impairment in ADLs. As

---

[9] At oral argument, counsel for plaintiff briefly argued that Blue Shield had not used the CALOCUS-CASII tool to arrive at its initial coverage decisions, but the administrative record belies that point.

a result, there is no clear compelling clinical rationale for the patient needing 24 hour residential services. The MD 2/11/21 appeal letter listed the patient's diagnosis as intermittent explosive disorder, but this is not corroborated in the progress notes from the residential program. Instead, a lower level of care would have been more appropriate for his treatment.

*See id.* (emphasis added). The Report then walks through each "dimension" of the CALOCUS, ranking M.F. below a 4 on all dimensions, and below a 23 composite score.

The reviewer also considered whether, "if the requested Residential Behavior Health . . . is not approvable according to the attached medical policy or guideline, would the requested service be considered medically necessary . . . based on the current peer-reviewed literature or national guidelines?" The reviewer answered "[n]o", stating:

"The published medical literature supports the admission of adolescent patients to residential treatment when there are severe emotional and behavioral symptoms which require 24 hour supervised mental health treatment. A summary of the collated criteria from several peer-reviewed sources of medical literature follows, with a listing of the required criteria symptoms. The symptoms would need to include one or more of: suicidal or homicidal ideation [Criterion not met, as there were no ongoing suicidal thoughts or homicidal ideation] or self-harming behaviors [Criterion not met, as the patient was not engaged in ongoing self-harming acts], serious physical aggression [Criterion not met], impairment in the activities of daily living (ADLs) [Criterion not met] , severe alcohol withdrawal symptoms [Criterion not met, as there was no reported drug/alcohol withdrawal], out of control disruptive behavior which cannot be safely managed in a less restrictive setting [Criterion not met], comorbid medical conditions and mental health symptoms which necessitate 24 hour nursing supervision [Criterion not met] (MCG, 2020; Martin, 2017; Thapar, 2017; InterQual, 2020). As none of these symptoms was documented, therefore, the requested service would not be considered medically necessary for this particular individual based on the current peer-reviewed literature or national guidelines."

*Id.*

After Jill T. appealed this decision through an IRO request submitted to the DMHC, MAXIMUS reviewed the same record and determined that while M.F. scored higher on some of the Dimensions than Blue Shield had originally stated, coverage was rightly denied for lack of medical necessity because M.F. scored below a 4 on the first three Dimensions and his composite score was below 23, meaning 24-hour residential treatment was not necessary. *See* CPS-JILLT-000667-68 (DMHC Decision).

Jill T. argues that Blue Shield and then the DHMC should have scored M.F. at a level 4 for

1    "Risk of Harm," "Functional Status," and "Co-Morbidity."  Pl's Motion 21-22.  A score of 4 or

2    higher for any one of those factors would have independently justified 24-hour residential

3    treatment regardless of M.F.'s composite score.  I review these Dimensions de novo.

####    a.    Dimension I: "Risk of Harm"

5    The first Blue Shield review gave M.F. a score of 1 on Dimension I, which measures "Risk

6    of Harm." A score of 1 indicates a "low risk of harm."  This is indicated by, among other things,

7    "[n]o . . . history of suicidal or homicidal ideation," and "no indication or report of physically or

8    sexually aggressive impulses." *See* CPS-JILLT-0000567 (CALOCUS Guidelines).  That did not

9    describe M.F. at the time of his admission to Blue Fire.  As explained, *see supra* "Background,"

10   when he was admitted to Blue Fire, M.F. had a history of physically lashing out at his parents.  As

11   for suicidal ideation, doctors had noted that M.F. had at least discussed the concept of wanting to

12   die before, making a score of 1 on "Risk of Harm" inappropriate.

13   That said, M.F's "Risk of Harm" score also did not rise to a score of 4.  A score of 4 on

14   Dimension I is appropriate where the child exhibits "[c]urrent suicidal or homicidal ideation with

15   either clear, expressed intentions and/or past history of carrying out such behavior," where the

16   child has also "expressed ambivalence about carrying out the safety plan and/or family's ability to

17   carry out the safety plan is compromised." *See id*.  This was not M.F.'s situation when he was

18   enrolled at Blue Fire, at least not according to the numerous doctors' reports in the administrative

19   record, many of which are referenced in plaintiff's two IRO requests.  M.F. displayed what could

20   be considered suicidal ideation once and was not suicidal or homicidal when he was admitted to

21   Blue Fire.  *See* CPS-JILLT-0000539 (Blue Fire IRO Request) (explaining that "[w]hile [M.F.] was

22   not suicidal or homicidal at the time of his admission, he has a past history of suicidal ideation

23   [and] his great-grandmother completed suicide[.]").  Nothing suggests that he became suicidal or

24   homicidal while at Blue Fire.  The evidence also shows that while M.F. was inarguably violent at

25   times toward his family, his behavior did not rise to the level of a 4 on the CALOCUS-CASII

26   scale, which describes "property destruction, repetitive fire-setting or violence toward animals."

27   CPS-JILLT-0000568 (CALOCUS-CASII Guidelines Reference Sheet).

28   M.F. should have been scored as a 3 on Dimension I.  A score of 2 is appropriate where the

United States District Court
Northern District of California

16

1  patient exhibits "occasional impulsivity and/or some physically . . . aggressive impulses with

2  minimal consequences to self or others." *Id.*  A score of 3 is appropriate where the patient exhibits

3  "episodic impulsivity, or physically . . . aggressive impulses that are moderately endangering to

4  self or others." *Id.*   The administrative record shows that M.F. attacked his father and left bite

5  marks on him.  This constituted an "indication or report of physically . . . aggressive impulses,"

6  *see id.*, and should have been considered by the claim administrator.  The DMHC did consider this

7  past behavior and scored M.F. at a 3.  So do I.

**b.    Dimension II: "Functional Status"**

9       Blue Shield scored M.F. at a 2 in Dimension II.  Dimension II measures "Functional

10  Status."  CPS-JILLT-0000616 (Peer Reviewer Final Report).  A score of 2 indicates "mild

11  functional impairment."  *See* CALOCUS Guidelines.  Jill T. argues that M.F. should have been

12  scored at a 4, which would have triggered qualification for Residential Treatment.

13       A score of 4 on Dimension II is appropriate where the patient demonstrates "[s]erious

14  deterioration of interpersonal interactions with consistently conflictual or otherwise disrupted

15  relations with others," "significant withdrawal and avoidance of almost all social interaction,"

16  "[c]onsistent failure to achieve self-care/hygiene at levels appropriate to age," "serious

17  disturbances in vegetative status, such as weight change, disrupted sleep or fatigue, and feeding or

18  elimination, which threaten physical functioning," and more.  *See* CALOCUS-CASII Guidelines.

19  M.F.'s functional status was not this poor when he was admitted to Blue Fire.  Reports from his

20  doctors suggest that he was "conflicted, withdrawn, and . . . troubled in relationships with . . .

21  family," which is consistent with a level 3.  *See id.*  That is where the DMHC scored him.

22       Jill T. asserts that a score of 3 indicates that those conflicted relationships should occur

23  "*without* episodes of physical aggression." *See* CALOCUS-CASII Guidelines.  M.F. had a history

24  of physical aggression, bun tot at the time of his admission to Blue Fire.  Violent episodes

25  apparently happened in "early 2020."  *See* Samantha Levy Letter (as attached to Cherry Gulch

26  IRO Request) (CPS-JILLT-0002254).  As indicated in a letter sent on August 25, 2020, which

27  appears to be an "Application for Enrollment" at Cherry Gulch, *see* Cherry Gulch IRO Request

28  (CPS-JILLT-0002256), Jill T. stated that "school refusal, refusal to discuss his mental health,

United States District Court
Northern District of California

1   mood swings, 24/7 gaming, defiance with parents is what led him to Blue Fire."  Episodes of

2   physical aggression are not mentioned.  I agree with the DMHC that M.F. should have been scored

3   a 3 on Dimension II at the time of his admission to Blue Fire.

4                         **c.**        **Dimension III: Co-Morbidity**

5       Blue Shield scored M.F. at a 3 in Dimension III, which measures "Co-Morbidity," i.e. "the

6   coexistence of disorders across four domains (psychiatric, substance use, medical and

7   developmental)." *See* CALOCUS-CASII Guidelines.  A score of 3 indicates that the patient has a

8   "significant" comorbidity.  This is appropriate where the patient has a developmental disability,

9   and where there are psychiatric signs and symptoms present that persist in the absence of stress,

10   which are "moderately debilitating, and adversely affect the presenting problem." *See id*.  The

11   DMHC affirmed this score.  CPS-JILLT-0000671.  This was the correct assessment.

12       Jill T. argues that M.F. should have been scored a 4, but the record does not support her

13   position.  A score of 4 is appropriate where medical conditions are present or have a high

14   likelihood of developing that "may require intensive, although not constant, medical monitoring,"

15   and where psychiatric signs and symptoms are present that "clearly impair functioning, persist in

16   the absence of stressors, and seriously impair recovery from the presenting problem."  *Id.*  She

17   argues that the IRO did not credit what she describes as M.F.'s "numerous other comorbid

18   conditions" besides his "disruptive mood dysregulation disorder, autism spectrum disorder,

19   attention-deficit hyperactivity disorder (ADHD), and unspecified depressive disorder." Pl's

20   Motion 24:8-10 (referencing DMHC Decision).

21       Contrary to her position, Blue Shield and the DMHC both acknowledged and considered

22   that M.F. had significant co-occurrence of conditions, "as evidenced by his neurodevelopmental

23   disorders including autism and ADHD, as well as psychiatric disorders disruptive mood

24   dysregulation disorder and depression."  DMHC Decision at CPS-JILLT-0000671.  The DMHC

25   decision also noted that M.F. had "developmental disability" that "may adversely affect the

26   presenting condition and may have required significant augmentation or alteration in treatment for

27   the presenting condition," or "adversely affect the presenting condition." *Id.*  This was an accurate

28   description of M.F.'s condition.  Letters attached to plaintiff's appeal of Blue Shield's Blue Fire

United States District Court
Northern District of California

coverage decision indicated that when he was admitted to Blue Fire, M.F. attended the program

"willingly," and had "made progress" in the years preceding Blue Fire, while still needing

additional help.  *See* CPS-JILLT-000450 (excerpts from Dr. Levy's letter of medical necessity).

The administrative record supports that M.F. should have been scored a 3 on Dimension III.

### d.  Dimensions IV-VI

With respect to Dimensions IV-VI, the plaintiff does not contest Blue Shield's initial score

or the DMHC's score on review.  I agree that the administrative record supports scores of 3 on

Dimension IV(a) and (b) ("Recovery Environment – Stress and Support"), a score of 4 on

Dimension V ("Patient Resiliency"), and a score of 2 on Dimension VI ("Engagement in

Treatment").

### e.  Composite Score

Considering the highest possible individual scores for each Dimension of the CALOCUS-

CASII guidelines, the highest possible composite score for M.F. at the time of his admission to

Blue Fire would have been **21**.  That is consistent with a level 4 on the CALOCUS-CASII

"Service Intensity Level Determination Grid," which compels "intensive integrated services

*without* 24-hour psychiatric monitoring."  CPS-JILLT-0000576 (CALOCUS Service Intensity

Level Determination Grid) (emphasis added).

### 2.  Cherry Gulch

Jill T. makes the same arguments that she made about Blue Fire with respect to Blue

Shield's denial of coverage for M.F.'s time at Cherry Gulch.  The arguments, while related, are

not per se interchangeable.

Blue Shield denied coverage for dates of service at Cherry Gulch from August 23, 2020,

through October 31, 2020, for lack of medical necessity.  The denial letter stated:

> "The request for treatment for your problem with social actions with
> others (Autistic Disorder) in a program (Residential Treatment
> Program) where you spend 24 hours under medical and nursing care
> [at] Cherry Gulch from August 23, 2020 to October 21, 2020 cannot
> be approved for payment. Based on the medical records sent in, you
> were not planning to harm yourself or others and could take care of
> many of your daily needs. You did not need around-the-clock care.
> You did qualify for Outpatient Care (with a Psychiatrist or Therapist)
> and Care in the Community. The decision was based on Blue Shield
> guidelines created by the American Academy of Child and

Adolescent Psychiatry to find out which is the best type of treatment
(level of care) that is needed to treat your mental health problems."
CPS-JILLT-0000604 (Cherry Gulch Denial Letter).  Nothing in the administrative record suggests
that M.F.'s score on any of the CALOCUS-CASII dimensions would have gone *up* after his time
at Blue Fire.  In fact, the record supports that it decreased as M.F.'s condition improved.

During his time at Cherry Gulch, M.F. was monitored by professionals 24 hours a day. The
record contains thousands of pages of therapy notes and behavior notes from Cherry Gulch
professionals reporting on M.F.'s status, behavior, wellness, and progress.  The notes span from
the start of M.F.'s time at Cherry Gulch to the end of his stay there.  Some of the first "Therapy
Notes" taken by a Cherry Gulch employee indicated that he participated in group therapy and
other activities, he was "positive and engaged," *see* CPS-JILLT-0002544, noted no physically
hurtful or threatening or scary behavior, and observed that he "did his hygiene," CPS-JILLT-
0002545.  The notes also show that M.F. and his parents had met with Cherry Gulch therapists and
spoken about M.F.'s overall well-being; M.F. reported that he "really like[d]" Cherry Gulch, and
his therapists noted that he was "pleasant and engaged" and that his "affect was normal." CPS-
JILLT-0002553 (Notes from August 27, 2020, Family Therapy Session with Parent).  Notes from
his very first session with a Cherry Gulch therapist, Stephanie Smith, stated that M.F. was
"engaged," and indicated no concerns about his safety or the safety of others around him.  The
record as illustrated by notes from two years of M.F.'s time at Cherry Gulch show that he
participated in group sessions regularly, was rarely cited for bad behavior, and regularly
participated in individual therapy.

There is no evidence that M.F.'s behavior, well-being, or health deteriorated in any way
while he was at Cherry Gulch.  He was improving.  Accordingly, my evaluation of M.F.'s
CALOCUS-CASII score upon admission to Blue Fire is applicable to the start of his time at
Cherry Gulch; the only plausible variation in that score would involve it decreasing as M.F.'s
mental health improved over time.

## C.     Lack of Prior Authorization

Both Blue Shield and the Magellan Defendants argue that in addition to failing for a lack
of medical necessity, Jill T.'s attempt to recover benefits fails because she never obtained prior

20

authorization for M.F.'s stays at Blue Fire and Cherry Gulch.  *See* Blue Shield Motion 19; Magellan Def's Motion 7-9.  They are correct.

The EOCs for both the 2020/2021 Plan and the 2021/2022 Plan require prior authorization for residential treatment of non-emergent mental health and substance use disorders, i.e. the kind of care for which Jill T. sought coverage.  *See* CPS-JILLT-0000027 ("[p]rior authorization is required for all non-emergent mental health or substance use disorder Hospital admissions including acute inpatient care and Residential care"); CPS-JILLT-0000115 (same).  They provide instructions on how members might contact Blue Shield's MHSA, which must be done "at least five business days prior to the admission."  CPS-JILLT-0000027.  They state that under the terms of the Plans, "[w]here prior authorization is required but not obtained, and the services provided are determined not to be a Benefit of the plan or Medically Necessary, Blue Shield may deny payment and you will be responsible for all billed charges." CPS-JILLT-0000026-27; CPS-JILLT-0000114.

Jill T. says that she tried to seek prior authorization.  She points to a phone call with Blue Shield customer service on May 6, 2020, the notes of which indicate that a Blue Shield representative told her that she would need to seek prior authorization.  *See* CPS-JILLT-0000204 (notes from May 6, 2020, call with Blue Shield customer service, stating that "all non-emergency inpatient mental health services, behavioral health [sic] treatment, outpatient partial hospitalization, and outpatient non routine services must be prior authorized by the MHSA … For prior authorization, members should contact the MHSA at 1-877-263-9952.").  These notes suggest that she was told to contact the MHSA for prior authorization, and the record is clear that she did not do so.

Jill T. argues that Blue Shield cannot rely on lack of prior authorization to defend itself against her ERISA claim because it  "never communicated" to her that M.F.'s treatment at Blue Fire and Cherry Gulch was being denied for lack of prior authorization.  *See* Pl's Oppo. 22:11-20 (citing *Harlick v. Blue Shield of California*, 686 F.3d 699 (9th Cir. 2012), for the rule that an insurer is foreclosed under ERISA from asserting denial reasons not raised during the administrative appeal process for the first time in litigation).  It is true that the denial letters that

1    she received in response to her grievances did not identify the lack of prior authorization as a

2    reason for denying her coverage; those letters indicated that the reason her claims were denied was

3    a lack of medical necessity.  *See* CPS-JILLT-000627-28 (May 7, 2021, Grievance Response

4    explaining denial of claims seeking coverage for June 3, 2020, to August 16, 2020), CPS-JILLT-

5    0000604 (March 23, 2021, Grievance Response explaining denial of claims seeking coverage for

6    August 23, 2020, to October 31, 2020).  And since these were the grievance responses that Jill T.

7    raised on appeal to the DMHC, the initial DMHC letter informing Blue Shield that it needed to

8    produce records for the purposes of the Independent Medical Review that Jill T. requested noted

9    that coverage had been denied for lack of "medical necessity" and did not mention prior

10   authorization.  *See* CPS-JILLT-0000715.

11        However, it is also the case that in addition to the Plans explicitly requiring prior

12   authorization and the telephone call with Blue Shield in May 2020, some of the first EOBs that Jill

13   T. received responding to her claims stated that "no benefits [were] allowed because pre-

14   authorization was not obtained prior to these services being rendered." *See* CPS-JILLT-0004613,

15   CPS-JILLT-0005089.  And when Blue Shield responded to the DMHC confirming that it was "in

16   receipt of the [DMHC] Complaint," it included in its list of the reasons for Blue Shield's coverage

17   denials that "[t]here was no request made to the MHSA for prior authorization for the Residential

18   Treatment for Mental Health . . . services referenced in this complaint."  CPS-JILLT-0000718.

19        This case is unlike *Harlick*, where the Ninth Circuit held that an insurer could not assert a

20   defense for coverage denial that it "never" asserted during the administrative process.  *See*

21   *Harlick*, 686 F.3d at 720.  Here, Blue Shield *did* assert the prior authorization issue during the

22   administrative process, albeit not in the grievance responses.  It informed Jill T. that she needed to

23   get prior authorization, and when she did not, communicated to her that her failure to do so was

24   one of the reason's her claim was being denied.  CPS-JILLT-0000026-27; CPS-JILLT-0000114.

25        While Blue Shield could have communicated more consistently, the fact remains that Jill

26   T. never sought nor received the requisite prior authorization from HAIC, despite being informed

27   it was required for coverage.  This further justifies Blue Shield's denial of coverage.

28

### III.    CLAIM 2: BREACH OF FIDUCIARY DUTIES UNDER ERISA § 502(A)(3)

In many ways, Jill T.'s second claim asserting breach of fiduciary duty is duplicative of her

first claim.  She argues that the defendants breached their fiduciary duties by denying her a "full

and fair review" of her claims and failing to engage in a meaningful dialogue about those claims.[10]

"To establish an action for equitable relief under . . . 29 U.S.C. § 1132(a)(3), the defendant must

be an ERISA fiduciary acting in its fiduciary capacity, and must violate ERISA-imposed fiduciary

obligations." *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1178 (9th Cir. 2004).

### A.    Against HAIC

Jill T. asserts her fiduciary duty claim against HAIC as well as against Blue Shield.  To

state a claim for breach of fiduciary duty under ERISA, a plaintiff must allege that "(1) the

defendant was a fiduciary; and (2) the defendant breached a fiduciary duty; and (3) the plaintiff

suffered damages." *Bafford v. Northrop Grumman Corp*., 994 F.3d 1020, 1026 (9th Cir. 2021).

There are two kinds of fiduciaries: named and functional fiduciaries.  *See id.*

Jill T. seems to allege that HAIC was a *functional* fiduciary insofar as it acted as the Plans'

MHSA.  A functional ERISA fiduciary is any party that exercises discretionary authority or

control respecting the management or administration of an employee benefit plan or its assets.

*Santomenno v. Transamerica Life Ins. Co*., 883 F.3d 833, 837 (9th Cir. 2018) (citing 29 U.S.C. §

1002(21)(A)).  To be liable for breach of fiduciary duty, the wrong that is alleged "must occur in

connection with the performance of a fiduciary function." *Bafford*, 994 F.3d at 1028.  The Ninth

Circuit has held that an exercise of "discretion" is one of the "central touchstones of a fiduciary

role." *See id.*

The only conceivable fiduciary function that HAIC would have served in the context of

Blue Shield's coverage decisions is reviewing members' requests for prior authorization.  I agree

with courts in this Circuit, which have held that where an independent review organization applies

---

[10] Jill T. at times conflates her substantive arguments about procedural errors with her argument
that Blue Shield committed so many procedural errors in its claim administration that I should
review its decisions de novo (or at least apply heightened skepticism to review for abuse of
discretion). I am reviewing Blue Shield's coverage decisions de novo. Her arguments about
procedural errors are relevant in considering whether Blue Shield breached its fiduciary duty
under ERISA by failing to provide a "full and fair review" of its claims process.

United States District Court
Northern District of California

medical criteria to make determinations regarding the medical necessity of a treatment, it is not acting as a fiduciary.  *See e.g. Josef K. v. California Physicians' Serv.*, 477 F. Supp. 3d 886 (N.D. Cal. 2020).  Others have found that where an entity "prepar[es] reports required by government agencies," it does not act within its discretionary capacity.  *See e.g. Del Castillo v. Cmty. Child Care Council of Santa Clara Cnty., Inc.*, 2018 WL 11361335, at *18 (N.D. Cal. Nov. 19, 2018).  As discussed in Section II(C), Jill T. never sought prior authorization from HAIC, for either Blue Fire or Cherry Gulch.  When Blue Shield eventually provided HAIC with M.F.'s claim file and asked HAIC to help Blue Shield respond to the DMHC's inquiry pertaining to plaintiff's IMR request, *see* CPS-JILLT-0002207-08, HAIC considered existing facts but exercised no discretion in that process.

HAIC's lack of a fiduciary role in the denial of plaintiff's claims requires that I grant judgment in its favor on plaintiff's breach of fiduciary duty claim.

### B.    Against Blue Shield

Blue Shield's claim handling process was sloppy at times.  It did not rise to the level of a breach of fiduciary duty.

ERISA provides that a plan administrator issuing a denial must provide the claimant with a written notification of the adverse decision that contains:

> (i) the specific reason or reasons for the adverse determination; (ii) reference to the specific plan provisions on which the determination is based; (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; (iv) a description of the plan's review procedures and the time limits applicable to such procedures . . . ; (v) in the case of an adverse benefit determination by a group health plan – (A) if an internal guideline was relied upon in making the determination, the specific guideline, or a statement that the guideline will be provided free of charge upon request; or (B) if the adverse determination is based on a medically necessity limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such an explanation will be provided free of charge upon request.

*See* 29 C.F.R. § 2560.503-1(g).  Jill T. describes Blue Shield's claims handling as "disorganized, incomplete, and arbitrary," and argues that Blue Shield's "introduction of new denial rationales in its moving papers . . . all but shreds basic ERISA law."  Pl's Oppo. 6:21-7:6; Pl's Motion 14-16.

1    The crux of her argument is that Blue Shield failed to engage in a meaningful dialogue with her

2    about her claims and denied her the opportunity of a "full and fair review" of its decisions. The

3    caselaw that she cites is largely inapposite because it involved situations where insureds were

4    consistently misled without the insurer's errors being corrected, or where plan administrators hid

5    the ball with respect to justifications for claim denials up until the moment of trial.  This is not that

6    case.

7          "A plan administrator may not fail to give a reason for a benefits denial during the

8    administrative process and then raise that reason for the first time when the denial is challenged in

9    federal court[.]" *Harlick*, 686 F.3d at 719.  In *Harlick*, the plan administrator "forfeited the ability

10   to assert [the medical necessity] defense in the litigation" because it "[o]nly once during its

11   extensive communication with [the plaintiff] suggest[ed] that medical necessity might be an

12   issue." *Id.*  This case is not analogous to that one.  Blue Shield is not trying to raise reasons for

13   coverage denial for the first time in federal court; it raised the lack of medical necessity numerous

14   times throughout its initial claim denials.  The independent bodies that reviewed its decisions did

15   the same.[11]

16         As discussed, Blue Shield communicated the wrong rationale for its coverage decision on

17   two occasions in January 2021.  CPS-JILLT-0004605; *see* CPS-JILLT-0000238.  Blue Shield

18   admits this was an error.  Blue Shield Oppo. 22-23.  It also incorrectly paid one claim, it says by

19   mistake.

20         In light of the entire claims process, however, these errors were not material.  They were

21   corrected (and Blue Shield did not seek to recoup its mistaken payment).  Blue Shield issued

22   numerous explanations for its denial decisions after the letters that erroneously referenced the

23   radiology care management program.  *See* CPS-JILLT-0004605-4614; CPS-JILLT-0005089-

24   0005242.   It responded to Jill T.'s appeals with letters that explained how it applied CALOCUS to

25   M.F.'s conditions and ultimately determined that based on CALOCUS guidelines, the treatment he

26

27   _____

     [11] *See supra*, Section II(C) for discussion of how Blue Shield offered the "prior authorization"
28   denial reason.

received was not medically necessary.  CPS-JILLT-0000374-376; CPS-JILLT-0000603-605.  It provided multiple layers of independent review, each of which confirmed that its coverage decision was correct.  Two psychiatrists at AMR confirmed the decision, *see* CPS-JILLT-0000723-25, and the DMHC confirmed it, albeit with a slightly different final CALOCUS-CASII score.  *See* CPS-JILLT-0000667-73.

Jill T. insists that Blue Shield failed to engage in a meaningful dialogue with her because its denial letters "failed to provide anything close to the specificity required under ERISA." Pl's Motion 16:1-10.  She contends that the letters "failed to describe the clinical basis for the denial, and what additional material(s) Jill T. should provide to perfect the claim." Pl's Motion 16:1-10; *see also* Pl's Oppo. 7-8.  But her argument relies upon an inapt comparison between other cases, where insurers should have provided the insured party with notice of what "additional material(s)" were needed to perfect the claim, and her own case, where coverage was denied on the basis that M.F.'s well-documented conditions did not render his long-term stays at Blue Fire and Cherry Gulch "medically necessary."  Blue Shield's responses to her grievances explained why it had denied coverage and provided her with information about how she could challenge the coverage decisions, which she did.  She argues that her "retrospective review request" was improperly treated as an appeal, *see* Pl's Motion 5-6, but offers no plausible reason why the two would be different.  Blue Shield did not shift its justifications for denial in such a way that unlawfully "held in reserve" a "known or reasonably knowable reason for denying a claim."  *See Spinedex Physical Therapy USA Inc. v. United Healthcare of AZ*, 770 F.3d 1282, 1296 (9th Cir. 2014).

Jill T. overreaches trying to analogize her case to *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863 (9th Cir. 2008) and *Spinedex Physical Therapy USA Inc. v. United Healthcare of AZ*, 770 F.3d 1282, 1296 (9th Cir. 2014).  In *Saffon*, the Ninth Circuit considered whether an ERISA plan administrator had properly terminated benefits where the plan beneficiary failed to produce evidence of her disability.  *See Saffon*, 522 F.3d at 866.  The plan's insurer and claims administrator, MetLife, began paying plaintiff Saffon short-term disability benefits.  Saffon eventually applied for long-term benefits, which MetLife also granted.  But after paying long-term benefits for a year, MetLife told Saffon that she " 'no longer m[et] the definition of

disability,'" and terminated her long term benefits. *Id.* Saffon sued. The trial court reviewed MetLife's decision for abuse of discretion, held that it had not abused its discretion, and denied Saffon relief.

The Ninth Circuit reversed. First, it held that the trial court had applied the wrong standard of review during the bench trial; it did not consider MetLife's conflict of interest when reviewing the Plan's coverage determination for abuse of discretion. On the merits, it concluded that there was no meaningful dialogue in the communications between Saffon and MetLife. The court described MetLife's termination letter as "uninformative," in that it did not explain why the medical information Saffon provided "no longer provid[ed] evidence of disability" and did not engage with contradictory opinions offered by medical doctors who submitted purported evidence of Saffon's disability to MetLife. *Id.* at 870. Compounding the issue, when Saffon appealed, offering even more information about her course of treatment, including evidence that her pain persisted through multiple different treatments, the doctor who reviewed Saffon's appeal stated that the evidence was "unconvincing" but did not explain why he was unconvinced. *Id.* The denial letter also contained contradictory language and relied on new justifications for denial on appeal that it did not give Saffon the opportunity to contest. The Ninth Circuit concluded that this violated its holding in *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006), which stated that an administrator "must provide a plan participant with adequate notice of the reasons for denial" so that she might contest those reasons. *See Saffon*, at 871 ("insofar as MetLife believed that a Functional Capacity Evaluation, or some other means of objectively testing Saffon's ability to perform her job, was necessary for it to evaluate Saffon's claim, it was required to say so at a time when Saffon had a fair chance to present evidence on this point."); *see also Abatie*, 458 F.3d at 974.

This case is nothing like *Saffon.* Blue Shield's coverage denials were clear and thorough. To be sure, Blue Shield's claims process was sloppy at times. But it corrected its errors, gave coherent explanations for its coverage decisions aside from the two in January 2021, and provided Jill T. with multiple levels of review, each of which confirmed its coverage decisions. This is not like *Saffon*, where the only claim decisions were contradictory, "unintelligible," and where the

27

appeal process was marred by the reviewing doctor failing to explain his reasoning for disregarding additional evidence of disability that the plaintiff had provided. *See Saffon*, at 860-70.

*Spinedex* also does not support Jill T.'s position. There, the Ninth Circuit reversed the district court's decision to grant summary judgment to the claim administrator for an ERISA-governed health plan. The court held, in relevant part, that "a [plan] administrator may not hold in reserve a known or reasonably knowable reason for denying a claim, and give that reason for the first time when the claimant challenges a benefits denial in court." *Spinedex*, at 1296.

That did not happen here. Blue Shield did not offer a new reason for denying coverage for the first time in court. It argues now, as it did when denying coverage, that it was not required to provide coverage because the treatment that M.F. received at Blue Fire and Cherry Gulch was not medically necessary. Blue Shield was not "hold[ing] in reserve a known or reasonably knowable reason for denying a claim," *see Spinedex*, at 1296; it expressed those reasons multiple times throughout its internal claim denial process. The DMHC repeated that reason to Jill T. in its independent review. *See* DMHC Decision. *Spinedex* prohibits ERISA defendants from raising new defenses in court unasserted during the claim handling process. Here, the defendants reassert defenses that they have asserted throughout various levels of the claim handling process.

Ultimately, Jill T.'s argument that Blue Shield ran "flagrantly afoul" of ERISA's "full and fair review" requirement focuses too narrowly on the denial notices Blue Shield issued in January 2021 that erroneously referenced "radiology authorization." CPS-JILLT-0000238. She argues that its denials were "nonsensical" and failed to identify for her what types of proof she needed to give it. But Blue Shield corrected those notices and issued several denial notices that explained that the Blue Fire and Cherry Gulch placements were not covered because they were not medically necessary. Blue Shield provided the metrics it used to evaluate medical necessity—the CALOCUS-CASII tool—and two levels of independent review confirmed that the treatment M.F. received was not medically necessary. This information was provided to Jill T. multiple times throughout 2021 and 2022. Moreover, she failed to get prior authorization for the treatment, despite being told that she had to. De novo review of the administrative record confirms that Blue Shield made the correct coverage decisions in this case.

United States District Court
Northern District of California

## CONCLUSION

For the foregoing reasons, judgment is GRANTED in favor of Blue Shield and the Magellan Defendants.  Plaintiff's motion is DENIED.

**IT IS SO ORDERED.**

Dated: October 31, 2024



William H. Orrick
United States District Judge

United States District Court
Northern District of California

29